RECEIPT NUMBER

200521973

ORIGINAL

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

NORTHLAND FAMILY PLANNING CLINIC, )
INC.; NORTHLAND FAMILY PLANNING )
CLINIC, INC. WEST; NORTHLAND FAMILY )
PLANNING CLINIC, INC. – EAST; SUMMIT )
MEDICAL CENTER, INC.; PLANNED )
PARENTHOOD MID-MICHIGAN ALLIANCE; )
and PLANNED PARENTHOOD OF SOUTH )
CENTRAL MICHIGAN, on behalf of themselves )
and their physicians, staff and patients; and )
STANLEY M. BERRY, M.D.; TIMOTHY R.B. )
JOHNSON, M.D.; KAROLNE S. PUDER, M.D.; )
and RONALD C. STRICKLER, M.D., on behalf )
of themselves and their patients, )
)
                    Plaintiffs, )
)
v. )
)
MICHAEL A. COX, Attorney General of the State )
of Michigan, in his official capacity; and KIM L. )
WORTHY, Prosecuting Attorney for Wayne )
County, in her official capacity, individually and )
as representative of a class of similarly situated )
prosecuting attorneys, )
)
                    Defendants. )

**♯ 27**

W/attach A

JUDGE : Hood, Denise Page
DECK : S. Division Civil Deck
DATE : 03/01/2005 @ 15:55:35
CASE NUMBER : 2:05CV70779
CMP NORTHLAND FAMILY PLANNING
VS. MICHAEL COX, ET AL (SI) JMC

**Magistrate Judge Steven D. Pepe**

## COMPLAINT

Plaintiffs, by and through their undersigned attorneys, bring this complaint against

the above-named Defendants, their employees, agents, and successors in office.

I.   Introductory Statement

1.    This civil rights action, arising under 42 U.S.C. § 1983, challenges the

constitutionality of Michigan Public Act 135 of 2004, the so-called "Legal Birth Definition

Act" (to be codified at Michigan Compiled Laws (M.C.L.) §§ 333.1081 – 333.1085) [hereinafter "the Act"]. A copy of the Act is attached as Exhibit A to this Complaint. The Act is scheduled to take effect on March 30, 2005.

2. The Act defines a human embryo or fetus that shows evidence of life as a "legally born person for all purposes under the law" (a "perinate") once any part of that embryo or fetus, still attached to the remainder, passes outside the woman's vaginal opening. Except in limited circumstances set forth in the Act, physicians who cause the death of such an embryo or fetus are subject to all of the criminal and civil liabilities that would apply to causing the death of a person.

3. Under the Act, Plaintiffs will be subject to the threat of severe criminal and other penalties for virtually any abortion they perform prior to fetal viability, as well as other medical procedures, and their patients will be denied medical care to the detriment of their health and rights.

4. The Act is unconstitutional. Simultaneously with the filing of this Complaint, Plaintiffs move the Court to enter a preliminary injunction on four grounds: first, the Act violates the right to privacy by banning virtually all safe and routinely used pre-viability abortion procedures, as well as other medical procedures; second, the Act does not adequately protect -- and affirmatively endangers -- the health of pregnant women; third, the Act does not adequately protect – and affirmatively endangers – the lives of pregnant women; and fourth, the Act is impermissibly vague.

II. Jurisdiction and Venue

2

5.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

6.     Plaintiffs' claim for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

7.     Venue is appropriate under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

III.   Parties

A. Plaintiffs

8.     Plaintiffs Northland Family Planning Clinic, Inc., Northland Family Planning Clinic, Inc. – West, and Northland Family Planning Clinic, Inc. – East (together, "Northland"), are women's reproductive health care facilities in Southfield, Westland, and Sterling Heights, Michigan, respectively.  Northland provides a full range of gynecological services, including: annual examinations and pap smears; pregnancy testing; non-directive options counseling; contraceptive counseling and services; detection and treatment of sexually transmitted diseases; and community outreach education programs.  In addition, Northland provides abortion services up to 24 weeks, as measured from the first day of the woman's last menstrual period ("LMP"), or until fetal viability (whichever is earlier).  Northland uses abortion procedures encompassed by the Act, including suction curettage and dilation and evacuation ("D&E") procedures.  Thus, Northland, its doctors, and its other staff reasonably fear that if they continue to perform these procedures, they will be

subject to criminal, civil and administrative penalties. Northland sues on its own behalf, and on behalf of its physicians, staff, and patients.

9. Plaintiff Summit Medical Center, Inc. ("Summit"), a women's reproductive health center facility in Detroit, Michigan, provides the following services: a full range of obstetrical and gynecological services; teen programs for birth control and abortion; community outreach education programs; prenatal care; pregnancy testing; detection and treatment of sexually transmitted diseases; non-directive options counseling; abortion up to 24 weeks LMP; contraceptive counseling and contraceptives. Summit provides prenatal care and obstetrical services in cooperation with the Hutzel Hospital in Detroit, Michigan. Summit uses abortion procedures encompassed by the Act, including suction curettage and D&E procedures. Thus, Summit, its doctors, and its other staff reasonably fear that if they continue to perform these procedures, they will be subject to criminal, civil and administrative penalties. Summit sues on its own behalf, and on behalf of its physicians, staff, and patients.

10. Plaintiff Planned Parenthood Mid-Michigan Alliance ("PP Mid-Michigan") is a not-for-profit reproductive health care facility with headquarters in Ann Arbor, Michigan, and additional clinics in Ypsilanti, Jackson, Benton Harbor, East Lansing, Brighton and Lansing, Michigan. PP Mid-Michigan provides its patients a range of services, including a full range of gynecological services; pregnancy testing; non-directive options counseling; contraceptive counseling; contraception; detection and treatment of sexually transmitted diseases; prenatal care; HIV testing and counseling; and abortions to 19 weeks LMP. PP Mid-Michigan uses abortion procedures encompassed by the Act, including suction

4

curettage and D&E procedures. Thus, PP Mid-Michigan, its doctors, and its other staff reasonably fear that if they continue to perform these procedures, they will be subject to criminal, civil and administrative penalties. PP Mid-Michigan sues on its own behalf, and on behalf of its physicians, staff, and patients.

11.    Plaintiff Planned Parenthood of South Central Michigan ("PP South Central Michigan") is a not-for-profit reproductive health care facility with headquarters in Kalamazoo, Michigan, and an additional clinic in Battle Creek, Michigan. PP South Central Michigan provides the following services: a full range of gynecological services or referrals; pregnancy testing; non-directive options counseling; contraceptive counseling; contraception; detection and treatment of sexually transmitted diseases; and abortion to 16 weeks LMP. PP South Central Michigan uses abortion procedures encompassed by the Act, including suction curettage and D&E procedures. Thus, PP South Central Michigan, its doctors, and its other staff reasonably fear that if they continue to perform these procedures, they will be subject to criminal, civil and administrative penalties. PP South Central Michigan sues on its own behalf, and on behalf of its physicians, staff, and patients.

12.    Stanley M. Berry, M.D., is a physician licensed to practice medicine in the State of Michigan. Dr. Berry is Corporate Chairman of the Department of Obstetrics and Gynecology at William Beaumont Hospital. He is board-certified in obstetrics and gynecology, with a sub-specialty certification in the area of maternal-fetal medicine. Dr. Berry provides his patients an array of services, including pre-conception counseling; fetal diagnosis using ultrasound, amniocentesis, chorionic villus sampling, and fetal blood sampling; fetal therapy to treat conditions such as fetal arrhythmia, anemia, and

5

thrombocytopenia; care for women with illnesses during pregnancy such as diabetes and hypertension; labor and delivery; and treatment using the labor induction method for cases of intrauterine fetal demise and for conditions in which the woman is losing or is almost sure to lose the pregnancy, such as pre-viable preterm premature rupture of membranes, intrauterine infection and pre-viable advanced cervical dilation. As department chair, Dr. Berry supervises all the obstetrician-gynecologists practicing at William Beaumont Hospital; his approval is necessary for the performance of any induced abortions in his department, which hospital policy allows either where necessary to preserve the woman's life or health or where the fetus has structural, chromosomal, or genetic anomalies. Abortion procedures used in Dr. Berry's department include suction curettage, early D&E, and induction. Dr. Berry also refers patients for D&E services. Dr. Berry performs, supervises, approves, or refers for procedures that are encompassed by the Act, including suction curettage, D&E, and induction. Thus, Dr. Berry reasonably fears that if he continues to perform, supervise, approve, or refer for these procedures, he will be subject to criminal, civil and administrative penalties. He sues on behalf of himself and his patients.

      13.    Plaintiff Timothy R.B. Johnson, M.D., is a physician licensed to practice medicine in the State of Michigan. Dr. Johnson is Bates Professor of the Diseases of Women and Children, Professor and Chair of the Department of Obstetrics and Gynecology, and research professor in the Center for Human Growth and Development, all at the University of Michigan Medical School. He is also Professor of Women's Studies at the University of Michigan. Dr. Johnson is board-certified in obstetrics and gynecology, with a sub-specialty certification in the area of maternal-fetal medicine. As department

chair, Dr. Johnson supervises all the obstetrician-gynecologists practicing at his hospital. He provides and supervises an array of services, including prenatal care; fetal diagnosis; labor and delivery; induced abortion; and treatment of pregnancy loss. He has direct responsibility for the services providing suction curettage, D&E, and induction. Dr. Johnson performs and supervises procedures that are encompassed by the Act. Thus, Dr. Johnson reasonably fears that if he continues to provide and supervise these procedures, he will be subject to criminal, civil, and administrative penalties. He sues on behalf of himself and his patients.

14.      Plaintiff Karoline S. Puder, M.D., is a physician licensed to practice medicine in the State of Michigan. Dr. Puder is Vice-Chief of the Department of Obstetrics and Gynecology at Sinai-Grace Hospital and Assistant Professor of Obstetrics and Gynecology at Wayne State University School of Medicine. Dr. Puder is board-certified in obstetrics and gynecology, with a sub-specialty certification in the area of maternal-fetal medicine. Dr. Puder provides her patients an array of services including genetic counseling; prenatal care; fetal diagnosis including ultrasound and amniocentesis; labor and delivery; induced abortion in cases of maternal or fetal indication; and treatment of pregnancy loss. For induced abortions and treatment of pregnancy loss in the first trimester, Dr. Puder uses the suction curettage method; at 13 and 14 weeks LMP, she uses the D&E method; thereafter, she uses the induction method or refers her patients for D&E services. Dr. Puder provides, supervises, and refers for procedures that are encompassed by the Act, including suction curettage, D&E, and induction. Thus, Dr. Puder reasonably fears that if she continues to provide, supervise, and refer for these services, she will be subject to criminal, civil and

7

administrative penalties. She sues on behalf of herself and her patients.

15.     Plaintiff Ronald C. Strickler, M.D., is a physician licensed to practice
medicine in the State of Michigan. He is Chair of the Department of Obstetrics and
Gynecology at The Henry Ford Hospital, Professor of Obstetrics and Gynecology at Wayne
State University School of Medicine, and Professor of Reproductive Biology at Case
Western Reserve University School of Medicine. Dr. Strickler is board-certified in
obstetrics and gynecology with a sub-specialty in the area of reproductive endocrinology.
Dr. Strickler provides his patients an array of services including treatment of endocrine
disorders, bleeding disorders, and conditions of menopause; laparoscopy, typically to
determine the cause of infertility; labor and delivery; and treatment of pregnancy loss using
the suction curettage and induction methods. As department chair, Dr. Strickler supervises
all the obstetrician-gynecologists practicing at Henry Ford Hospital; his approval is
necessary for the performance of any induced abortions in his department, which hospital
policy allows either where necessary to preserve the woman's life or health or where the
fetus has structural, chromosomal, or genetic anomalies. Dr. Strickler performs, supervises,
and approves procedures that are encompassed by the Act, including suction curettage and
induction. Dr. Strickler reasonably fears that if he continues to perform, supervise, and
approve these procedures, he will be subject to criminal, civil, and administrative penalties.
He sues on behalf of himself and his patients.

### B. Defendants

16.     Defendant Michael A. Cox is the Attorney General of the State of Michigan.
He is responsible for enforcement of the Act and for supervising local prosecuting

8

attorneys. Defendant Cox is sued in his official capacity, as are his successors.

17.     Defendant Kim L. Worthy is the Prosecuting Attorney for Wayne County, Michigan. She is responsible for criminal enforcement of the Act in that County. Defendant Worthy is sued in her official capacity and as a class representative of all prosecuting attorneys in Michigan.

18.     This action is maintained as a class action under Rule 23(b)(1) of the Federal Rules of Civil Procedure against a class of all prosecuting attorneys in Michigan, who are each responsible for criminal enforcement of the Act in their respective counties.

19.     On information and belief, there are approximately 83 prosecuting attorneys with authority to enforce the Act's definition of a perinate. Thus the defendant class is so numerous that the joinder of all members is impracticable.

20.     The questions of law and fact which Plaintiffs seek to litigate, in particular the constitutionality of the Act, are common to all members of the defendant class.

21.     The claims or defenses of Defendant Worthy will be typical of the claims and defenses of the class in that they involve the constitutionality of the same statute.

22.     Defendant Kim Worthy will fairly and adequately represent the interests of the defendant class. Her position as Prosecuting Attorney for Wayne County, which is the most populous county in Michigan, places her in essentially the same position with respect to this challenge as all other members of the defendant class. Because the functions of all prosecuting attorneys with respect to this statute are substantially the same, Ms. Worthy will be able to represent the interests of all prosecuting and assistant prosecuting attorneys.

23.     This case may be maintained as a class action under Rule 23(b)(1)(A) & (B)

9

because the prosecution of separate actions against individual members of the defendant class would create a risk of (i) inconsistent or varying adjudications which would establish incompatible standards of conduct for Plaintiffs, and (ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members of the defendant class not parties to the adjudications or substantially impair or impede their ability to protect their interests.

IV. The Statutory Framework

24.     Under the Act, a "perinate" is a "legally born person for all purposes under the law." M.C.L. § 333.1083(1).

25.     The Act defines a "perinate" as a "live human being at any point after which any anatomical part of the human being is known to have passed beyond the plane of the vaginal introitus [i.e., opening] until the point of complete expulsion or extraction from the mother's body." Id. § 333.1085(d).

26.     The Act defines "live" as demonstrating one or more of the following: (i) a detectable heartbeat; (ii) evidence of breathing; (iii) evidence of spontaneous movement; (iv) umbilical cord pulsation." Id. § 333.1085(c).

27.     The Act defines "anatomical part" as "any portion of the anatomy of a human being that has not been severed from the body, but not including the umbilical cord or placenta." Id. § 333.1085(a).

28.     The Act provides that "Nothing in this act shall abrogate any existing right, privilege, or protection under criminal or civil law that applies to an embryo or fetus." Id. §

333.1084.

29.    The Act applies regardless of the stage of gestation of the pregnancy, regardless of fetal viability, and regardless of whether the embryo or fetus is intact.

30.    The Act does not prohibit any specific conduct. Rather, it makes a "perinate" a person with independent legal rights under Michigan law, and thus any act or omission by the physician that harms a "perinate" gives rise to the same "criminal, civil, or administrative liability," id. § 333.1083(2), that would attach if the embryo or fetus were in fact a born person.

31.    The Act immunizes physicians from such liability in three circumstances:

"(a) If the perinate is being expelled from the mother's body as a result of a spontaneous abortion.

(b) If in that physician's reasonable medical judgment and in compliance with the applicable standard of practice and care, the procedure was necessary in either of the following circumstances:

(i) To save the life of the mother and every reasonable effort was made to preserve the life of both the mother and the perinate.

(ii)  To avert an imminent threat to the physical health of the mother, and any harm to the perinate was incidental to treating the mother and not a known or intended result of the procedure performed."

Id. §333.1083(2).

32.    The Act defines an imminent threat to physical health as "a physical

11

condition that if left untreated would result in substantial and irreversible impairment of a major bodily function." Id. § 333.1085(b).

V. The Act's Effect On Women's Health and Access To Abortion and Other Services

33.    The Act subjects physicians using almost any common method of abortion to a host of severe penalties under Michigan law. The Act thus functions as a virtual ban on abortion.

34.    In both the first and second trimesters of pregnancy, the vast majority of abortions are performed using surgical methods. In the first trimester, the method is "suction curettage," in which the physician empties the uterus with suction. In the second trimester, the method is "dilation and evacuation" or "D&E," in which the physician empties the uterus with a combination of suction and forceps. In both the first and second trimesters, almost all the remaining abortions are performed by administering medications which trigger the woman's system to empty the uterus on its own. All of these abortion methods are safe. In extremely rare circumstances, a physician may accomplish abortion by abdominal surgery (hysterectomy or hysterotomy), which carries far higher risks for the woman.

35.    The safest and most appropriate abortion procedure for any given woman depends on a range of factors, including the woman's health, any medical contraindications, the stage of pregnancy, the physician's skill and experience, the woman's preferences, and the woman's prior surgical history.

36.    The embryonic period lasts approximately through eight weeks LMP, after

12

which time the embryo is considered a fetus. A fetus becomes viable at approximately 24 weeks LMP.

37. First-Trimester Suction Curettage: In the suction curettage procedure, the physician first dilates the cervix (the lower part of the uterus that opens into the vaginal canal), inserts a plastic tube into the uterus, and then uses suction to remove the embryo or fetus and other products of conception. During the procedure, some part of the fetus that is still attached to the remainder of the fetus may pass "beyond the plane of the vaginal introitus," while the embryo or fetus has one of the indicia of life enumerated in the Act. Continued application of suction results in fetal demise, either because the suction destroys the embryo or fetus or because it is not viable outside the uterus.

38. Second-Trimester D&E: In the D&E procedure, the physician dilates the cervix and then uses a combination of suction and forceps to draw the fetus out of the uterus. Sometimes, the physician withdraws the fetus from the uterus largely intact. For example, the physician withdraws the fetus from the uterus largely intact up to the head and then must compress the fetal skull in order to complete removal of the fetus. At other times, the physician may bring a part of the fetus through the cervix attached to the rest of the fetus in the uterus, and the counter-resistance of the remainder of the fetus against the cervix causes the fetal part to disjoin. The physician will then continue to extract the remainder of the fetus, perhaps with further disjoining, or with compression of larger parts. In each of these scenarios, part of the fetus with one of the enumerated indicia of life may be "beyond the plane of the vaginal introitus," but the fetus not fully extracted, when the physician performs an act that results in the death of the fetus.

39.     Second-Trimester Medication Abortion: In the second trimester, almost all abortions that are not D&Es are performed using the induction method.  In performing induction abortions, the physician induces uterine contractions by administering one of several medicines vaginally, orally, rectally, or into a vein.  Sometimes, during an induction procedure, a part of the fetus with one of the Act's enumerated indicia of life may emerge "beyond the plane of the vaginal introitus," but the fetus is not completely expelled.  Continued delivery of the fetus would result in its demise.  Sometimes, when the fetus cannot be completely expelled, variations of the surgical steps described above must be used to complete the abortion, and the use of these steps can kill the fetus.

40.     The suction curettage, D&E, and induction abortion methods are used not only to induce abortion, but also to treat or complete pregnancy loss.  In some instances of pregnancy loss, the embryo or fetus remains in the uterus, while having one of the Act's enumerated indicia of life, and a physician must employ one of these abortion methods to empty the uterus.

41.     Conversely, the two abortion methods involving major abdominal surgery, which are far more dangerous for the woman, are not criminalized by the Act, because such methods do not entail "pass[age] beyond the plane of the vaginal introitus."  Those methods are hysterectomy, which is the removal of the uterus, and hysterotomy, which involves making a surgical incision through the abdominal wall and into the uterus to deliver the fetus.  They are unacceptable as abortion methods except in extremely rare circumstances.

42.     When performing any abortion, the physician knows that by the end of the procedure the fetus will have died.  During the procedure, the physician focuses on

14

ensuring the complete evacuation of the uterus as quickly and safely as possible for the woman; the physician does not focus on when in the course of the procedure the fetus dies.

43.     In rare circumstances, the Act would also criminalize certain actions and omissions on a doctor's part when delivering a fetus at term. For example, in completing the delivery of a fetus with fatal anomalies even at term, a physician, knowing the fetus has no chance of survival, generally will not take actions to preserve the life of the fetus where such actions would endanger the woman. However, such omissions, if they resulted in the demise of the fetus, would be criminal under the Act.

44.    The Act immunizes physicians from liability for performing a procedure that harms a perinate in certain circumstances involving a spontaneous abortion or harm to the woman's life or health. M.C.L. § 333.1083(2)(a)-(b). These exceptions are inadequate and/or so limited in their application as to endanger the lives and health of pregnant women. Moreover, these exceptions protect neither those assisting the physician nor women procuring abortions from liability.

45.    The Act uses terminology that does not describe any particular medical procedure or procedures. As a result, the Act criminalizes a broad range of procedures and actions physicians regularly perform during virtually any common method of pre-viability abortion, as well as certain obstetrical procedures, leaving physicians to guess as to what procedures or actions are encompassed by the Act. In addition, it is unclear, in light of the Act's definition of the term "imminent threat to the [woman's] physical health," whether such threat must be "imminent" in order for the Act's health exception to apply. Moreover, physicians cannot know what the Act means by its requirement that the

physician make "every reasonable effort" to preserve the life of the perinate when he performs a life-saving abortion, as it is impossible to preserve the life of an embryo or pre-viable fetus outside the uterus. Thus, the Act fails to give adequate notice to physicians of what procedures or actions will subject them to liability.

46.     The Act's lack of clarity also allows prosecutors to differ widely about what conduct they believe gives rise to liability. As a result, the Act subjects physicians and others to arbitrary and discriminatory enforcement.

47.     If doctors in Michigan were to stop providing procedures that are encompassed by the Act, it would make abortions almost impossible to obtain in Michigan, and would prevent some women from obtaining abortions altogether. Some women would be forced to have a hysterotomy or hysterectomy, at significant risk to their lives and health.

48.     Other women would travel significant distances out of state to obtain an abortion. Of those women, many would be delayed in obtaining abortions due to the costs, burdens and complications of travel. Because the risks of abortion increase significantly with advancing gestational age, women who travel out of state are likely to have riskier abortions than if they could have obtained an abortion in Michigan.

49.     If physicians stop providing, or are curtailed in providing, the most appropriate treatment for women in need of care criminalized by the Act, including the treatment of pregnancy loss in some instances, women will suffer medical harm.

50.     The Act unduly interferes with women's ability to obtain safe abortion procedures prior to viability and other necessary medical care, while neither fostering maternal health nor furthering the state's interest in potential life. It therefore lacks

16

justification.

## VI. Injunctive Relief

51.     Plaintiffs have no adequate remedy at law and will suffer irreparable harm

and continued violations of their constitutional rights and the rights of their patients if the

Act goes into effect. Plaintiffs are likely to succeed on the merits of their claims and

Defendants will not be harmed by a continuation of the status quo pending the final

resolution of this lawsuit.

## First Claim for Relief

52.     Plaintiffs hereby incorporate by reference paragraphs 1 through 51 above.

53.     By prohibiting physicians from performing abortions before the viability of

the fetus, the Act has the purpose and effect of imposing an undue burden on women's right

to choose abortion in violation of their right to privacy and liberty guaranteed by the

Fourteenth Amendment and 42 U.S.C. § 1983.

## Second Claim for Relief

54.     Plaintiffs hereby incorporate by reference paragraphs 1 through 53 above.

55.     By prohibiting physicians from performing a range of medical procedures –

including virtually all safe and common abortion methods, regardless of the stage of

pregnancy--and by limiting the circumstances under which a physician may perform these

procedures to preserve the woman's life and health, the Act violates the right to privacy,

life, and liberty guaranteed by the Fourteenth Amendment and 42 U.S.C. § 1983.

## Third Claim for Relief

56.     Plaintiffs hereby incorporate by reference paragraphs 1 through 55 above.

57.    By failing to give adequate notice of the conduct proscribed, and encouraging arbitrary and discriminatory enforcement, the Act is impermissibly vague in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

### Fourth Claim for Relief

58.    Plaintiffs hereby incorporate by reference paragraphs 1 through 57 above. By endangering the health and lives of women, but not men, the Act violates the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs ask this Court:

A)    to issue a preliminary injunction and a permanent injunction restraining Defendants, their employees, agents and successors from enforcing the Act;

B)    to enter judgment declaring the Act to be in violation of the United States Constitution and 42 U.S.C. § 1983; and

C)    to grant such other and further relief as this Court should find just and proper, including attorney's fees and costs.

Dated: March ____, 2005

_Linda A. Rosenthal / MJS_
Linda A. Rosenthal
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, New York 10005
(917) 637-3600

_David A. Nacht / MJS_
David A. Nacht, P.C. (P47034)
201 South Main, Suite 1000

Respectfully submitted,

_Talcott Camp / MJS_
Talcott Camp
Chakshu S. Patel (*admission pending*)
Reproductive Freedom Project
American Civil Liberties Union
    Foundation
125 Broad Street, 18th Floor
New York, New York 10004-2400
(212) 549-2633

18

Ann Arbor, MI 48104
(800) 240-9044
(734) 663-7550

*Attorneys for Northland Clinics and
Summit Medical Center, Inc.*

*Attorneys for Individual Physicians*

Donna Lee (*admission pending*)
Roger Evans (*admission pending*)
Planned Parenthood Federation of
    America, Inc.
434 West 33rd Street
New York, New York 10001
(212) 541-7800

*Attorneys for Planned Parenthood
Mid-Michigan Alliance and Planned
Parenthood of South Central
Michigan*

Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
American Civil Liberties Union
    Fund of Michigan
60 West Hancock Street
Detroit, Michigan 48201
(313) 578-6814

*Attorneys for Individual Physicians
and Planned Parenthood Plaintiffs*



## LEGAL BIRTH DEFINITION ACT
### Act 135 of 2004

An initiation of Legislation to define legal birth and the commencing of legal personhood and rights; and to provide immunity for certain acts.

History: 2004, Act 135, Eff. (sine die).

Compiler's note: This new act was proposed by initiative petition pursuant to Const 1963, art 2, § 9. On June 9, 2004, the initiative petition was approved by an affirmative vote of the majority of the Senators elect and filed with the Secretary of State. On June 9, 2004, the initiative petition was approved by an affirmative vote of the majority of the Members elect of the House of Representatives and filed with the Secretary of State. The Legislature did not vote pursuant to Const 1963, art 4, § 27, to give immediate effect to this enactment.

***** 333.1081.new THIS NEW SECTION IS EFFECTIVE 91 DAYS AFTER ADJOURNMENT OF THE 2004 SESSION SINE DIE *****

### 333.1081.new Short title.

Sec. 1. This act shall be known and may be cited as the "legal birth definition act".

History: 2004, Act 135, Eff. (sine die).

***** 333.1082.new THIS NEW SECTION IS EFFECTIVE 91 DAYS AFTER ADJOURNMENT OF THE 2004 SESSION SINE DIE *****

### 333.1082.new Findings.

Sec. 2. The following findings are hereby made:

(a) That in Roe v Wade the United States supreme court declared that an unborn child is not a person as understood and protected by the constitution, but any born child is a legal person with full constitutional and legal rights.

(b) That in Roe v Wade the United States supreme court made no effort to define birth or place any restrictions on the states in defining when a human being is considered born for legal purposes.

(c) That, when any portion of a human being has been vaginally delivered outside his or her mother's body, that portion of the body can only be described as born and the state has a rational basis for defining that human being as born and as a legal person.

(d) That the state has a compelling interest in protecting the life of a born person.

History: 2004, Act 135, Eff. (sine die).

***** 333.1083.new THIS NEW SECTION IS EFFECTIVE 91 DAYS AFTER ADJOURNMENT OF THE 2004 SESSION SINE DIE *****

### 333.1083.new Perinate as legally born person; immunity.

Sec. 3. (1) A perinate shall be considered a legally born person for all purposes under the law.

(2) A physician or an individual performing an act, task, or function under the delegatory authority of a physician is immune from criminal, civil, or administrative liability for performing any procedure that results in injury or death of a perinate while completing the delivery of the perinate under any of the following circumstances:

(a) If the perinate is being expelled from the mother's body as a result of a spontaneous abortion.

(b) If in that physician's reasonable medical judgment and in compliance with the applicable standard of practice and care, the procedure was necessary in either of the following circumstances:

(i) To save the life of the mother and every reasonable effort was made to preserve the life of both the mother and the perinate.

(ii) To avert an imminent threat to the physical health of the mother, and any harm to the perinate was incidental to treating the mother and not a known or intended result of the procedure performed.

History: 2004, Act 135, Eff. (sine die).

***** 333.1084.new THIS NEW SECTION IS EFFECTIVE 91 DAYS AFTER ADJOURNMENT OF THE 2004 SESSION SINE DIE *****

### 333.1084.new Existing right, privilege, or protection.

Sec. 4. Nothing in this act shall abrogate any existing right, privilege, or protection under criminal or civil law that applies to an embryo or fetus.

History: 2004, Act 135, Eff. (sine die).

© Legislative Council, State of Michigan

***** *333.1085.new THIS NEW SECTION IS EFFECTIVE 91 DAYS AFTER ADJOURNMENT OF THE 2004 SESSION SINE DIE* *****

### 333.1085.new Definitions.

Sec. 5. As used in this act:

(a) "Anatomical part" means any portion of the anatomy of a human being that has not been severed from the body, but not including the umbilical cord or placenta.

(b) "Imminent threat to the physical health" means a physical condition that if left untreated would result in substantial and irreversible impairment of a major bodily function.

(c) "Live" means demonstrating 1 or more of the following biological functions:

(i) A detectable heartbeat.

(ii) Evidence of breathing.

(iii) Evidence of spontaneous movement.

(iv) Umbilical cord pulsation.

(d) "Perinate" means a live human being at any point after which any anatomical part of the human being is known to have passed beyond the plane of the vaginal introitus until the point of complete expulsion or extraction from the mother's body.

(e) "Physician" means an individual licensed by the state to engage in the practice of medicine or osteopathic medicine and surgery under article 15 of the public health code, 1978 PA 368, MCL 333.16101 to 333.18838.

History: 2004, Act 135, Eff. (sine die).

Rendered Friday, February 18, 2005

Page 2

Michigan Compiled Laws Complete Through PA 598 of 2004
Regular Session and the 2004 Constitutional Amendments

© Legislative Council, State of Michigan

*Courtesy of www.legislature.mi.gov*

*Hood 170779/SDP*

JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

# 05-70779

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Northland Family Planning Clinic, Inc., et al. (for a full list of plaintiffs see Attachment A)

**DEFENDANTS**

Michael A. Cox, Attorney General, and Kim L. Worthy, Wayne County Prosecutor, in their official capacity,

**(b)** County of Residence of First Listed Plaintiff **Oakland**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant **Ingham**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

See Attachment A for full list of plaintiffs' attorneys

Attorneys (If Known)

# DENISE PAGE HOOD

## Magistrate Judge Steven D. Pepe

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☑ 2 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                  and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 442 Employment | Habeas Corpus: | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☑ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

*POSSIBLE COMPANION CASE*

**V. ORIGIN** (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. § 1983 and U.S. Const. amend. XIV

Brief description of cause:
Constitutional challenge to the Michigan Legal Birth Definition Act

**VII. REQUESTED IN COMPLAINT:**

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☑ No

**VIII. RELATED CASE(S) IF ANY**

(See instructions):   JUDGE   Arthur J. Tarnow   DOCKET NUMBER 00-CV-70585 and 00-CV-70586

DATE **3/1/05**

SIGNATURE OF ATTORNEY OF RECORD   (MICHAEL J. STEINBERG)

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

SUANT TO LOCAL RULE 83.11

1.          Is this a case that has been previously dismissed?          ☐ Yes
                                                                        ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


2.          Other than stated above, are there any pending or previously          ☒ Yes
            discontinued or dismissed companion cases in this or any               ☐ No
            other court, including state court?  (Companion cases are
            matters in which it appears substantially similar evidence will
            be offered or the same or related parties are present and the
            cases arise out of the same transaction or occurrence.)

If yes, give the following information:

            U.S. District Court for the Eastern District of Michigan
Court: _____

Case No.: ___00-CV-70585 and 00-CV-70586_____

            Arthur J. Tarnow
Judge: _____


Notes:
_____

## ATTACHMENT A – PARTIES AND ATTORNEYS

NORTHLAND FAMILY PLANNING CLINIC, INC.; NORTHLAND FAMILY
PLANNING CLINIC, INC. – WEST; NORTHLAND FAMILY PLANNING CLINIC,
INC. – EAST; SUMMIT MEDICAL CENTER, INC.; PLANNED PARENTHOOD
MID-MICHIGAN ALLIANCE; and PLANNED PARENTHOOD OF SOUTH
CENTRAL MICHIGAN, on behalf of themselves and their physicians, staff and patients;
and STANLEY M. BERRY, M.D.; TIMOTHY R.B. JOHNSON, M.D.; KAROLNE S.
PUDER, M.D.; and RONALD C. STRICKLER, M.D., on behalf of themselves and their
patients,

Plaintiffs,

v.

MICHAEL A. COX, Attorney General of the State of Michigan, in his official capacity;
and KIM L. WORTHY, Prosecuting Attorney for Wayne County, in her official capacity,
individually and as representative of a class of similarly situated prosecuting attorneys,

Defendants.

_____/

Linda A. Rosenthal
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, New York 10005
(917) 637-3600

David A. Nacht, P.C. (P47034)
201 South Main, Suite 1000
Ann Arbor, MI 48104
(734) 663-7550

Attorneys for Northland Clinics and
  Summit Medical Center, Inc.


Talcott Camp
Chakshu S. Patel (admission pending)
Reproductive Freedom Project
American Civil Liberties Union
  Foundation
125 Broad Street, 18th Floor
New York, New York 10004-2400
(212) 549-2633

Attorneys for Individual Physicians

Donna Lee (admission pending)
Roger K. Evans (admission pending)
Planned Parenthood Federation
  of America, Inc.
434 West 33rd Street
New York, New York 10001
(212) 541-7800

Attorneys for Planned Parenthood
Mid-Michigan Alliance and
Planned Parenthood of South
Central Michigan


Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
American Civil Liberties
  Union Fund of Michigan
60 West Hancock Street
Detroit, Michigan 48201
(313) 578-6814

Attorneys for Individual Physicians and
  Planned Parenthood Plaintiffs

## ATTACHMENT B – COMPANION CASE STATEMENT

Pursuant to Local Rule 83.11(b)(7), parties must bring to the Court's attention any "companion case" to a case that is being filed. "Companion cases" include ones in which "substantially similar evidence will be offered at trial," or in which "the same or related parties are present, and the cases arise out of the same transaction or occurrence." L.R. 83.11(b)(7)(A)(i)-(ii). Companion cases include those that have already been terminated. L.R. 83.11(b)(7)(A)(ii).

The instant case is a companion case to Womancare v. Granholm (Docket No. 00-CV-70585) and Evans v. Granholm (Docket No. 00-CV-70586), consolidated cases that were before Judge Tarnow. See Womancare v. Granholm 143 F. Supp. 2d 849 (E.D. Mich. 2001) ("Womancare"). That is because substantially similar evidence will be offered at trial.[1]

The evidence offered in this case will be substantially similar to   and even largely identical to – the evidence offered in Womancare. Womancare challenged the constitutionality of the "Infant Protection Act," Mich. Comp. Laws ("M.C.L.") § 750.90g; the instant case challenges the constitutionality of the new "Legal Birth Definition Act," Michigan Public Act 135 of 2004 (to be codified as M.C.L. §§ 333.1081-333.1085). The evidence will be similar because the two laws are "triggered" by the identical occurrence: the passage of any non-severed part of a living fetus "beyond the plane of the vaginal introitus."

The Infant Protection Act challenged in Womancare made it a crime to kill a "live infant," defined as a "human fetus at any point after any part of the fetus is known to exist outside of the mother's body and has 1 or more of the following: (i) A detectable heartbeat. (ii) Evidence of spontaneous movement. (iii) Evidence of breathing. M.C.L. § 750.90g(6)(a). "Part of the fetus" was defined as "any portion of the body of a human fetus that has not been severed from the fetus, but not including the umbilical cord or placenta." M.C.L. § 750.90g(6)(c). "Outside of the mother's body" was defined as "beyond the outer abdominal wall or *beyond the plane of the vaginal introitus*." M.C.L. § 750.90g(6)(b) (emphasis added).

The Legal Birth Definition Act challenged here declares a "perinate" to be "a legally born person for all purposes under the law," M.C.L. § 333.1083(1), and defines a "perinate" as a "live human being at any point after which any anatomical part of the human being is known to have passed *beyond the plane of the vaginal introitus*." § 333.1085(d) (emphasis added). "Live" is defined as demonstrating 1 or more of the following: "(i) A detectable heartbeat. (ii) Evidence of breathing. (iii) Evidence of

---

[1]     In addition to the evidence in this case being substantially similar to the evidence presented in Womancare, many of the parties in the two cases are the same: Plaintiffs Northland Family Planning Clinic, Inc., Northland Family Planning Clinic, Inc. – West, Northland Family Planning Clinic, Inc. – East, Planned Parenthood of Mid-Michigan, Planned Parenthood of South Central Michigan, and Timothy R. B. Johnson, M.D., were also plaintiffs in Womancare; the defendant in Womancare was the same defendant as in the instant case: the Attorney General for the State of Michigan in his official capacity; and the Plaintiffs in this challenge are similarly seeking relief against a class of prosecutors throughout the State of Michigan.

spontaneous movement. (iv) Umbilical cord pulsation. § 333.1085(c). "Anatomical part" is defined as "any portion . . . that has not been severed from the body, but not including the umbilical cord or placenta." § 333.1085(a).

Just as in Womancare, Plaintiffs in the instant case will offer evidence that a law that criminalizes killing a fetus after passage of any non-severed part beyond the vaginal introitus effectively bans virtually all abortions throughout pregnancy, including suction curettage, D&E, and induction abortions. Just as in Womancare, Plaintiffs will offer evidence on surgical procedures and on how a non-severed part of an embryo or fetus routinely passes beyond the plane of the vaginal introitus during virtually any abortion procedure.

The evidence in this case may also be similar to the evidence in Evans v. Kelley, 977 F. Supp. 1283 (E.D. Mich. 1997) (Rosen, J.). However, the so-called "partial-birth abortion" ban challenged in Evans v. Kelley does not share the "trigger" common to the law challenged in the instant case and in Womancare. See Evans v. Kelley, 977 F. Supp. at 1289-90 (quoting "partial-birth abortion" ban). Thus, although the evidence presented regarding pre-viability abortion procedures criminalized by these statutes may be similar, Evans v. Kelley is not a companion case.

2