## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

NORTHLAND FAMILY PLANNING
CLINIC, INC., *et al.,*

         Plaintiffs,

v.

MICHAEL A. COX, Attorney General of the
State of Michigan, *et al.,*

         Defendants.

_____/

Case No. 05-CV-70779
Honorable Denise Page Hood
United States District Judge

## MEMORANDUM OPINION AND ORDER

### I.   BACKGROUND/FACTS

On March 1, 2005, Plaintiffs Northland Family Planning Clinic, Inc., Northland Family

Planning Clinic, Inc.-West, Northland Family Planning Clinic, Inc.-East, Summit Medical Center,

Inc., Planned Parenthood Mid-Michigan Alliance, Planned Parenthood of South Central Michigan,

Stanley M. Berry, M.D., Timothy R.B. Johnson, M.D., Karoline S. Puder, M.D., and Ronald C.

Strickler, M.D., filed the instant class action against Defendants Michael A. Cox, Attorney General

of the State of Michigan, and Kym L. Worthy, Prosecuting Attorney for Wayne County, in their

official capacities. The Complaint seeks preliminary and permanent injunctive relief and declaratory

judgment.

Plaintiffs allege four claims for relief. The first claim is that by prohibiting physicians from

performing abortions before the viability of the fetus, the Act has the purpose and effect of imposing

an undue burden on women's right to choose abortion in violation of their right to privacy and

liberty guaranteed by the Fourteenth Amendment and 42 U.S.C. § 1983. The second claim is that

by prohibiting physicians from performing a range of medical procedures–including virtually all safe and common abortion methods, regardless of the stage of pregnancy–and by limiting the circumstances under which a physician may perform these procedures to preserve the woman's life and health, the Act violates the right to privacy, life, and liberty guaranteed by the Fourteenth Amendment and 42 U.S.C. § 1983. The third claim is that by failing to give adequate notice of the conduct proscribed, and encouraging arbitrary and discriminatory enforcement, the Act is impermissibly vague in violation of the Fourteenth Amendment and 42 U.S.C. § 1983. The fourth claim is that by endangering the health and lives of women, but not men, the Act violates the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983.

Michigan Public Act 135 of 2004, known as the Legal Birth Definition Act, codified as Michigan Compiled Laws (M.C.L.) §§ 33.1081-333.1085, was proposed by an initiative petition pursuant to Article 2, § 9 of the Michigan Constitution (1963), and passed by the Michigan Legislature in June 2004. M.C.L. § 333.1081; Compiler's Note. The Act was scheduled to take effect on March 30, 2005. The parties entered into a Stipulation agreeing to a Temporary Restraining Order until the Court ruled on the Motion for Preliminary Injunction. (March 14, 2005, Stipulation and Order)

Plaintiffs claim that the Act, M.C.L. § 33.1083(1), defines a "perinate" as a "legally born person for all purposes under the law." (Complaint, ¶ 24) A "perinate" is defined in M.C.L. § 333.1085(d) as a "live human being at any point after which any anatomical part of the human being is known to have passed beyond the plane of the vaginal introitus [i.e., opening] until the point of complete expulsion or extraction from the mother's body." (Complaint, ¶ 25) "Live," in M.C.L. § 33.1085(c), is defined as demonstrating one or more of the following: "(i) a detectable heartbeat;

2

(ii) evidence of breathing; (iii) evidence of spontaneous movement; (iv) umbilical cord pulsation." (Complaint, ¶ 26) The Act, under M.C.L. § 33.1085(a) defines an "anatomical part" as "any portion of the anatomy of a human being that has not been severed from the body, but not including the umbilical cord or placenta." (Complaint, ¶ 27) M.C.L. § 333.1084 provides that, "[n]othing in this act shall abrogate any existing right, privilege or protection under criminal or civil law that applies to an embryo or fetus." (Complaint, ¶ 28). Plaintiffs claim that the Act applies regardless of the stage of gestation of the pregnancy, regardless of fetal viability, and regardless of whether the embryo or fetus is intact. (Complaint, ¶ 29)

Plaintiffs further claim that under the Act, M.C.L. § 33.1083(2), a "perinate" is a person with independent legal rights under Michigan law and that any act or omission by a physician that harms a "perinate" gives rise to the same "criminal, civil, or administrative liability" that would attach if the embryo or fetus were in fact a born person. (Complaint ¶ 30) The Act immunizes physicians from such liability under M.C.L. § 333.1083(2) in three circumstances. The first is where the perinate is being expelled form the mother's body as a result of a spontaneous abortion. The second and third circumstances are, if in the physician's reasonable medical judgment and in compliance with the applicable standard of practice and care, a medical procedure was necessary to save the life of the mother and every reasonable effort was made to preserve the life of both the mother and the perinate, or, to avert an imminent threat to the physical health of the mother and any harm to the perinate was incidental to treating the mother and not a known or intended result of the procedure performed. (Complaint, ¶ 31) An imminent threat to physical health is defined in the Act, M.C.L.§ 333.1085(b) as "a physical condition that if left untreated would result in substantial and irreversible impairment of a major bodily function." (Complaint, ¶ 32)

3

Plaintiffs allege that the Act subjects physicians using almost any common method of abortion to a host of severe penalties under Michigan law and it functions as a virtual ban on abortion. (Complaint, ¶ 33) During the first trimester, abortions are performed by "suction curettage" where the physician empties the uterus with suction. In the suction curettage procedure, the physician first dilates the cervix, which is the lower part of the uterus that opens into the vaginal canal, inserts a plastic tube into the uterus, then uses a suction to remove the embryo or fetus and other products of conception. During this procedure, Plaintiffs claim some part of the fetus that is still attached to the remainder of the fetus may pass "beyond the plane of the vaginal introitus," while the embryo or fetus has one of the indicia of life enumerated in the Act. (Complaint, ¶ 37)

In the second trimester, the method used is "dilation and evacuation" or "D&E." The physician dilates the cervix and then uses a combination of suction and forceps to draw the fetus out of the uterus. Sometimes the physician withdraws the fetus from the uterus largely intact. At other times, the physician may bring a part of the fetus through the cervix attached to the rest of the fetus in the uterus, and the counter-resistance of the remainder of the fetus against the cervix causes the fetal part to disjoin. In each of these scenarios, part of the fetus with one of the enumerated indicia of life may be "beyond the plane of the vaginal introitus." The fetus may not be fully extracted when the physician performs the act which results in the death of the fetus. (Complaint, ¶ 38)

A physician may also perform an abortion using the induction method during the second trimester where the physician induces uterine contractions by administering one of several medicines vaginally, orally, rectally, or into a vein. Sometimes, during this procedure, a part of the fetus with one of the Act's enumerated indicia of life, may emerge "beyond the plane of the vaginal introitus," but the fetus is not completely expelled. The continued delivery of the fetus would result in its

4

demise. When the fetus cannot be completely expelled, variations of the surgical steps described above must be used to complete the abortion, resulting in the demise of the fetus. (Complaint, ¶ 39)

The suction curettage, D&E and induction abortion methods are used to induce abortion and to treat or complete pregnancy loss. During a pregnancy loss, the embryo or fetus remains in the uterus, while having one of the Act's enumerated indicia of life, and a physician must employ one of these methods to empty the uterus. (Complaint, ¶ 40) When performing any of the methods, a physician knows that by the end of the procedure the fetus will die. The physician does not focus on when the fetus dies but ensures the complete evacuation of the uterus as quickly and safely as possible for the woman. (Complaint, ¶ 42)

Plaintiffs claim that the Act would criminalize certain actions and omissions by a doctor when delivering a fetus at term. For example, if a physician knows the fetus has no chance of survival during the delivery of a fetus with fatal anomalies at term, the physician generally will not take actions to preserve the life of the fetus where such actions would endanger the woman. If the fetus dies at this state, the physician's act would be criminal under the Act. (Complaint, ¶ 43)

Plaintiffs claim that two abortion methods involving major abdominal surgery, a hysterectomy, which involves the removal of the uterus, and hysterotomy, involving making a surgical incision through the abdominal wall and into the uterus to deliver the fetus, are not criminalized under the Act. These two methods do not entail the passage beyond the plane of the vaginal introitus. Plaintiffs claim these abortion methods are generally unacceptable as abortion methods except in extremely rare circumstances and are far more dangerous to the woman. (Complaint, ¶ 41)

Plaintiffs assert that the portion of the Act which immunizes physicians from liability for

5

performing a procedure which would harm a perinate, such as a spontaneous abortion or harm to the woman's life or health, are inadequate and are so limited in their applications which would endanger the lives and health of the pregnant women. The exception found in M.C.L. § 33.1083(2)(a)-(b) does not immune from liability those assisting the physician nor the women procuring abortions. (Complaint, ¶ 4)

Plaintiffs argue the Act fails to give adequate notice to the physicians as to what procedures or actions will subject the physicians to liability. Plaintiffs claim the Act uses terminology which does not describe any particular medical procedure, which leaves physicians to guess as to what procedures or actions are encompassed by the Act. The term "imminent threat to the woman's physical health" is unclear because it could mean that the "threat" must be "imminent" in order for the Act's health exception to apply. Also, the term that a physician make "every reasonable effort" to preserve the life of the perinate when performing a life-saving abortion is impossible to do because it is impossible to preserve the life of an embryo or pre-viable fetus outside the uterus. (Complaint, ¶ 46)

Plaintiffs further argue that the Act's lack of clarity allows prosecutors to differ widely about what conduct they believe gives rise to liability. Women would be forced to have a hysterectomy or hysterotomy, which places women at significant risk, instead of the other methods of abortion. The treatment of pregnancy loss would be criminalized and women would suffer medical harm for lack of treatment and women would be forced to travel significant distances to obtain a safe abortion elsewhere. (Complaint, ¶¶ 47-49)

This matter is before the Court on various motions filed by the parties: Plaintiffs' Motion to consolidate Motion for Preliminary Injunction and Trial on the Merits; Plaintiffs' Motion for

6

Preliminary Injunction; Defendants' Motion to Dismiss; and, Motion to Intervene. Responses and replies have been filed by the parties. At the hearing, the parties agreed to consolidate the preliminary injunction hearing with the trial on the merits because only issues of law are before the Court. Fed. R. Civ. P. 65(a)(2). The Court will first address Defendants' Motion to Dismiss before addressing the merits of the case.

## II.   DEFENDANTS' MOTION TO DISMISS

Rule 12(b)(6) provides for a motion to dismiss for failure to state a claim upon which relief can be granted. This type of motion tests the legal sufficiency of the plaintiff's Complaint. *Davey v. Tomlinson*, 627 F. Supp. 1458, 1463 (E.D. Mich. 1986). In evaluating the propriety of dismissal under Rule 12(b)(6), the factual allegations in the Complaint must be treated as true. *Janan v. Trammell*, 785 F.2d 557, 558 (6th Cir. 1986). If matters outside the pleading are presented in a Rule 12(b)(6) motion, the motion shall be treated as one for summary judgment under Rule 56(b) and disposed of as provided in Rule 56.

Defendants argue that based on the Attorney General's Opinion issued on April 4, 2005, OAG 2005, No. 7174, the Act only applies to the dilation and extraction abortion procedure (D&X), known as partial-birth abortion, and not to constitutionally protected procedures, such as the D&E procedure. Defendants claim that the Attorney General has the authority to direct State and local officials on the proper construction of the Act. The Attorney General's Opinion further affirms the immunity provisions contained in the Act to comport with the constitutional requirements for a maternal health exception as set forth in *Stenberg v. Carhart,* 530 U.S. 914, 938-39 (2000), followed by the Sixth Circuit in *Women's Medical Professional Corp. v. Taft,* 353 F.3d 436, 445 (6th Cir. 2003). The Sixth Circuit held that partial birth abortions could be banned if the statute provides a

7

medical exception that, based on reasonable medical judgment by a physician, the D&X procedure was necessary to safeguard the mother against significant health risks. *Taft,* 353 F.3d at 445.

Plaintiffs respond, stating that the Attorney General's Opinion is not binding on either the state or federal courts. *See Donahoo v. Household Fin. Corp.,* 472 F.Supp. 353, 355 (E.D. Mich. 1979). Plaintiffs argue that courts have rejected attorney general opinions if the interpretation of the state statute was inconsistent with the plain language of the statute or the intent of the legislature. *See, Auto-Owners Ins. Co. v. Stenberg Bros., Inc.,* 575 N.W.2d 79, 81 & n. 1 (Mich. Ct. App. 1997); *Reinelt v. Mich. Pub. Sch. Employees' Ret. Bd.,* 276 N.W.2d 858, 861 (Mich. Ct. App. 1979). In *Stenberg,* Plaintiffs argue that the United States Supreme Court discussed numerous reasons for rejecting the Nebraska attorney general's interpretation because the opinion was not binding on courts, as is the case in Michigan. *Stenberg,* 530 U.S. at 941. Plaintiffs claim that the Attorney General's opinion rewrote the statute, which the Attorney General has no authority to do.

Based on the Supreme Court's ruling in *Stenberg,* "case law makes clear that we are not to give the Attorney General's interpretative views controlling weight." 530 U.S. at 940. The Attorney General's opinion narrows the Act's application to D&X procedures. Nowhere in the language of the Act does it state that the Legislature intended to limit the Act to D&X procedures only. The Act focuses on the "perinate" and any acts by a physician to endanger the "perinate."

The Attorney General's Opinion does not have the authority of ruling on the constitutionality of a statute. *See Cramer v. Vitale,* 359 F.Supp.2d 621, 628 (E.D. Mich. 2005)(the role of federal courts is to protect constitutional rights). Even though the Attorney General's Opinion directs the state prosecutors to only apply the statute to D&X procedures, the Opinion does not constitute a ruling on the constitutionality of the Act. The Court cannot accept the Attorney General's opinion

8

as the only interpretation of the Act. The Attorney General's Motion to Dismiss is denied.

## III.  MERITS OF THE CASE

### A.  Undue Burden on Right to Reproductive Choice

Plaintiffs state that in *Stenberg* and in *Planned Parenthood v. Casey,* 505 U.S. 833, 846 (1992), the Supreme Court reaffirmed the essential holding of *Roe v. Wade*, that the Constitution protects a woman's right to choose to terminate a pre-viable or non-viable pregnancy. Plaintiffs argue that the Act reaches much more than a single abortion procedure because the Act equates "perinate" with a "legally born person" once any non-severed part is beyond the vaginal opening. The Act, therefore, creates a ban on actions at the heart of abortion procedures from the earliest stages of pregnancy, whether used to perform induced abortions or to treat pregnancy loss.

Plaintiffs submitted the declarations of Michael I. Hertz, M.D., Medical Director of PPSCM, and Stanley M. Berry, M.D., Corporate Chairman of the Department of Obstetrics and Gynecology at William Beaumont Hospital, stating that the Act would ban a physician's ability to perform most abortion procedures based on the definition under the Act. (Hertz Decl., ¶¶ 11, 34-36; Berry Decl. ¶¶ 6-7, 16) The Act implicates the suction curettage, D&E, and induction methods of abortion, without regard to whether the embryo or fetus is intact or viable. (Hertz Decl., ¶¶ 11, 34-36; Berry Decl., ¶¶ 16-18) The Act would be in direct violation of the Supreme Court precedent in *Stenberg* which noted that a ban on even a single pre-viability abortion procedure can constitute an undue burden on the woman's right to reproductive choice. *Stenberg,* 530 U.S. at 938-46.

Defendants respond that based on the Michigan Attorney General's Opinion, the Act only applies to D&X methods of abortion, which the Sixth Circuit has found to be constitutional. *See Taft,* 353 F.3d at 445. As noted above, the Attorney General's Opinion is not binding on any courts.

9

A reading of the specific language of the Act supports Plaintiffs' arguments in that the Act would ban all pre-viable abortion procedures, including the suction curettage, D&E and induction methods of abortion, which the Supreme Court has found to be safe and that banning such procedures can constitute an undue burden on the woman's right to reproductive choice. *Stenberg,* 530 U.S. at 938-46.

The Act defines a "perinate" as a "live human being at any point after which any anatomical part of the human being is known to have passed beyond the plane of the vaginal introitus [i.e., opening] until the point of complete expulsion or extraction from the mother's body." M.C.L. § 333.1085(d). "Live" is defined as demonstrating one or more of the following: "(i) a detectable heartbeat; (ii) evidence of breathing; (iii) evidence of spontaneous movement; (iv) umbilical cord pulsation." M.C.L. § 33.1085(c). An "anatomical part" as "any portion of the anatomy of a human being that has not been severed from the body, but not including the umbilical cord or placenta." M.C.L. § 33.1085(a).

As noted by Dr. Berry in his Declaration, abortion procedures including suction curettage, D&E and induction, entail removal of an embryo or fetus through the woman's vaginal introitus and these procedures are performed to induce abortion and to treat pregnancy loss. (Berry Decl., ¶ 6) The embryo or fetus is generally living at the beginning of the procedure and the physician knows that by the end of the procedure the embryo or fetus will have died. (Hertz Decl., ¶ 29; Berry Decl., ¶ 14) Generally, the physician's focus is to perform the procedure as safely as possible for the women and ensuring the complete evacuation of the uterus, regardless of which abortion procedure is used. (Hertz Decl., ¶ 29; Berry Decl., ¶ 14) In any of these procedures, a non-severed part of the embryo or fetus with a heartbeat may be "beyond the plane of the vaginal introitus" when the

10

physician takes steps to complete the abortion procedure, and that the physician knows the fetus will not survive at the end of the procedure. (Hertz Decl., ¶¶ 34-36; Berry Decl., ¶¶ 16-18)

The Act does not describe any specific procedure to be banned. The Act also does not distinguish between induced abortion and pregnancy loss. Based on the language of the Act, Plaintiffs have carried their burden to show that the Act creates an undue burden on a woman's right to choose an abortion.

**B.     Protection of Women's Health**

Plaintiffs claim that because the Act fails to protect women's health, therefore, the Act is unconstitutional on its face. They argue that the importance of maternal health is a unifying thread that runs throughout the Supreme Court's abortion decisions, as noted in the recent case, *Stenberg*. *Stenberg*, 530 U.S. at 931 ("a State may promote but not endanger a woman's health when it regulates the methods of abortion"). The Sixth Circuit has concluded that a statute regulating abortion requires a maternal health exception that permits the banned procedure when necessary to prevent a significant health risk. *Taft*, 353 F.3d at 449. Plaintiffs argue that the Act, which purports to create personhood throughout pregnancy and without regard to fetal viability, lacks an operative health exception. Although the Act contains language that exempts a physician from liability to avert an imminent threat to the physical health of the mother, when any harm to the perinate it not a known result, the Declarations submitted by Plaintiffs show that the harm to the embryo or fetus is always a known result–its death. (Hertz Decl., ¶ 37; Berry Decl., ¶ 24). Plaintiffs claim the health exception under the Act is entirely meaningless.

Again, Defendants do not specifically address this argument, other than noting that based on the Attorney General's Opinion directing the prosecutors to apply the Act to D&X abortions

11

only. Defendants claim that the Sixth Circuit in *Taft* has held that regulation of D&X abortions is constitutional if the statute provides an exception to preserve the life and health of the mother. *Taft,* 353 F.3d at 445. Defendants argue that the Ohio statute addressed in *Taft* contained a maternal health exception based on "reasonable medical judgment" which the Sixth Circuit found to be constitutional. *Id.* at 445.

The Ohio statute contains a medical health exception allowing D&X procedures based on a reasonable medical judgment of a physician that the mother's health and life are in danger. Ohio Rev. Code Ann. § 2919.15(C). The language in the Michigan statute requires the health exception only when a procedure is necessary to "avert an imminent threat to the physical health of the mother, *and* any harm to the perinate was incidental to treating the mother *and* not a known or intended result of the procedure performed." M.C.L. § 333.1083(2)(b)(ii)(emphasis added). This language differs significantly from the Ohio statute found constitutional by the Sixth Circuit. The Ohio statute does not contain language that the physician must consider the fetus' health, whereas the Michigan statute expressly notes that the physician must consider harm to the perinate. The Ohio statute does not contain any language stating that the D&X procedure could not be performed if the physician had knowledge of the intended harm to the perinate. The Michigan statute expressly notes that the physician may only consider a procedure if there is an "imminent threat" to the mother's health and the harm to the perinate is "not a known or intended result" of the procedure performed. M.C.L. § 33.1083(2)(b)(ii). Plaintiffs argue that physicians always know the outcome of the procedure. They support their argument by submitting the Declarations stating that the harm to the embryo or fetus is always a known or intended result of every abortion. ((Hertz Decl., ¶ 37; Berry Decl., ¶ 24).

Plaintiffs have shown that the health exception of the Act is not the same as the language in

12

the Ohio statute found to be constitutional by the Sixth Circuit. Plaintiffs have carried their burden that the health exception provision of the Act is meaningless because physicians always know the intended harm and result of every abortion.

## C.    Life Exception

Plaintiffs argue that the Act's life exception is also constitutionally inadequate. Defendants claim that the Act is constitutional because the Michigan Attorney General's Opinion specifically applies the Act to D&X procedures only.

The Act insulates physicians from liability if a procedure is "necessary ... to save the life of the mother *and* every reasonable effort was made to preserve the life of both the mother and the perinate." M.C.L. § 333.1083(2)(b)(i). The Declarations submitted by Plaintiffs state that a requirement that a physician attempt to sustain the life of an embryo or pre-viable fetus, which has no chance of survival outside of the uterus, is irrational and further jeopardizes the woman's life. (Hertz Decl., ¶ 40; Berry Decl., ¶ 27) The Supreme Court in *Thornburgh v. American College of Obstetricians & Gynecologists,* 476 U.S. 747 (1986) stated that where there no chance of survival outside of the uterus, a requirement that a physician attempt to sustain the life of an embryo or pre-viable fetus is irrational. *Thornburgh,* 476 U.S. at 768-69. The Supreme Court has also held that the requirement that a physician balance the interests of the woman against the embryo or pre-viable fetus is impermissible. *Id.* at 768. The language in this Act which absolves a physician from liability only if the procedure is "necessary" to save the life of the mother "and" every reasonable effort was made to preserve the life of "both" the mother and the perinate essentially requires the physician to balance the interests of the woman and the "perinate." This requirement is unconstitutional under *Thornburgh.*

13

Plaintiffs have shown that the life exception under the Act is unconstitutional. Based on *Thornburgh,* the requirement in the Act which requires the physician to balance the interests of the woman against the "perinate" is unconstitutional on its face.

**D.    Void for Vagueness**

Plaintiffs finally argue that the Act is unconstitutionally vague in violation of the Fourteenth Amendment's Due Process Clause because the Act is confusing and ambiguous. Plaintiffs claim that the Act does not specify what medical procedures are banned and fails to set forth specific penalties for violations of its terms. Plaintiffs argue that the Act bans a wide range of medically safe procedures. The Act's definition of the term "perinate" as a legally born person is contradicted by the medical community's understanding of when a fetus is born. Plaintiffs claim that in the medical community, a fetus is not born until it is fully outside of the woman's body. (Berry Decl., ¶ 20) Plaintiffs also argue that the Act's "health exception" is a nullity and its own terms confusing. The Act's requirement that there must be an "imminent threat" to a woman's physical health is confusing in that the Act does not define what constitutes an imminent threat. (Berry Decl., ¶ 25) This requires that a physician must wait until medical harm is imminent before their actions would be exempted under the Act. (Hertz Decl., ¶ 38; Berry Decl., ¶ 25) The requirement to save a woman's life only if the physician has made every reasonable effort to preserve the life of the perinate is vague because the term "reasonable effort" is not defined and there are no circumstances where an embryo or pre-viable fetus would be able to survive outside the woman's uterus. (Hertz Decl., ¶ 40; Berry Decl., ¶¶ 16, 27)

Defendants rely on their argument that the Michigan Attorney General's Opinion cures any vagueness argument by Plaintiffs.

14

A statute is unconstitutionally vague and in violation of the Fourteenth Amendment's Due Process Clause if the statute conditions potential liability on confusing and ambiguous criteria which presents serious problems of notice and discriminatory application. *See Colautti v. Franklin,* 439 U.S. 379, 395 (1979). A statute is unconstitutionally vague if it threatens to inhibit the exercise of constitutionally protected rights and subjects individuals to criminal penalties. *Colautti,* 439 U.S. at 391; *Kolender v. Lawson,* 461 U.S. 352, 358 n. 8 (1983). Plaintiffs have shown that the Act is vague because it does not specify what medical procedures are banned and does not set forth specific penalties for violations of its terms. Plaintiffs have shown that the definition of the term "perinate" is not a commonly used definition within the medical community. As to the Act's health exception, the language is confusing in that the terms "imminent threat" and "every reasonable effort" (to preserve the life of the perinate) are not defined and require a physician to wait until the woman is in "imminent" danger before performing any medical procedure. As supported by Plaintiffs, there is no circumstance which allows an embryo or a pre-viable fetus to be able to survive outside the woman's uterus.

Plaintiffs have shown that the Act is confusing and vague and does not place the physicians on notice regarding what actions on their part will constitute a violation of the Act. Plaintiffs have carried their burden that the language in the Act is void for vagueness and, therefore, is unconstitutional.

## IV. MOTIONS TO INTERVENE

Two parties seek to intervene in this case. The organization called Standing Together To Oppose Partial-birth-abortion ("STTOP") seeks intervention as a defendant in this case under Fed.R.Civ.P. 24(a), as a matter of right, or alternatively, under Rule 24(b), for permissive

15

intervention. STTOP is an organization created by the Right to Life of Michigan organization to specifically enact certain legislation opposing abortions. Plaintiffs oppose STTOP's intervention in this case but does not oppose granting STTOP *amici* status. Marty Jo Fleser and Mark Robinson, Chair and Vice-Chair of the Choose Life Caucus of the Michigan Democratic Party, seek to intervene as *amici curiae* only. No opposition has been filed to this motion.

Rule 24 allows intervention as of right or by permission in an "action" before the district court. *See* Fed.R.Civ.P. 24(a) and (b). Rule 24(a) states:

> Upon timely application, anyone shall be permitted to intervene in an action ... when the applicant claims that the interest relating to the property ... which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter ... impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed. R. Civ. P. 24(a). Four criteria must be met for intervention as a matter of right: 1) the application is timely; 2) the party must have a substantial legal interest in the case; 3) the party must demonstrate that its ability to protect that interest will be impaired in the absence of intervention; and, 4) there must be inadequate representation of that interest by the current party. *See Michigan State AFL-CIO v. Miller,* 103 F.3d 1240, 1245 (6th Cir. 1997). If any of these criteria are not satisfied, a motion to intervene must be denied. *Stupak-Thrall v. Glickman,* 226 F.3d 467, 471 (6th Cir. 2000).

As to the first factor, STTOP's motion was timely since it was filed immediately after the case was filed.

Regarding the second factor, STTOP argues it has expended time, effort and resources to ensure the enactment of the Act and, therefore, it has a vested interest in ensuring the

16

constitutionality of the Act. The Sixth Circuit has limited intervention as of right to membership organizations, longstanding organizations with missions broader than the enactment of a single piece of legislation. *See, County Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477 (6th Cir. 2002). STTOP appears to be a "ballot question committee," not a longstanding organization with a broader mission than to enact a single piece of legislation. STTOP's interest is a generalized interest in one issue. Those supporting a certain legislation, including legislators, have been denied intervention because individual legislators who voted for the enactment of certain legislation do not have standing to challenge the constitutionality of an enacted legislation. *See, Planned Parenthood of Mid-Missouri and Eastern Kansas v. Ehlmann*, 137 F.3d 573, 578 (8th Cir. 1998). Anti-abortion groups are not traditionally permitted to intervene in constitutional challenges to state and local laws regulating abortion. *See, Diamond v. Charles*, 106 S.Ct. 1697, 1705 (1986). STTOP is unable to meet the second criteria.

Addressing the third and fourth criteria, although STTOP argues that the Attorney General is unable to fully protect their interest, there is no dispute that the Attorney General is charged with defending the interests of Michigan citizens and defending any acts enacted by the legislature. *See, Keith*, 93 F.R.D. at 823. The Attorney General in this case has submitted various briefs and has urged the Court to dismiss the matter. STTOP has not shown that the Attorney General is unable to fully protect their interest in the litigation.

Permissive intervention is discretionary under Rule 24(b). Plaintiffs have submitted various documents showing that the Right to Life of Michigan is openly hostile to Plaintiffs. Plaintiffs claim that based on STTOP and the Right to Life of Michigan's ideological goals, its presence would seriously delay the adjudication and resolution of the matter since other issues would be raised by

17

STTOP. Because the Attorney General has fully litigated the constitutional issue before the Court, permissive intervention will not be allowed in this case.

Plaintiffs do not oppose participation by STTOP as *amicus curiae*. The Court considers STTOP and Fleser and Robinson's papers filed as *amici* briefs.[1] Although STTOP seeks additional time to file a brief in opposition to Plaintiffs' Motion for Preliminary Injunction, because the Court has denied STTOP's Motion to Intervene as a party in this case and the parties have agreed to consolidate the preliminary injunction hearing with a hearing on the merits of the case, any additional briefs on the Motion for Preliminary Injunction are not required.

## V.   CONCLUSION

The Court declares that the Michigan statute, known as the Legal Birth Definition Act, M.C.L. § 333.1081 *et seq.,* is unconstitutional. As more fully set forth above, the Act places an undue burden on the woman's right to reproductive choice, fails to contain language protecting the health of the pregnant woman, contains a life exception language which is constitutionally inadequate and includes language which is unconstitutionally vague.

Accordingly,

IT IS ORDERED that Defendants' Motion to Dismiss **(Docket No. 19, filed April 11, 2005)** is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for an Order to Consolidate Hearing

---

[1] On May 17, 2005, Plaintiffs submitted a Notice of Filing attaching a brochure by the Right to Life of Michigan, "You're Being Robbed." This is to support Plaintiffs' claim that STTOP, a part of the Right to Life of Michigan, is essentially a fund-raising organization. In response, STTOP opposes the "Notice" stating it is untimely filed and not pertinent. It is noted that the brochure had no bearing on the Court's analysis regarding the intervention motion.

18

on Motion for Preliminary Injunction with a Final Hearing on the Merits **(Docket No. 37, filed June 2, 2005)** is GRANTED, as agreed to by the parties at the hearing.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Preliminary Injunction **(Docket No. 3, filed March 1, 2005)** is MOOT, the Court having ruled on the merits of the case.

IT IS FURTHER ORDERED that STTOP's Motion to Intervene **(Docket No. 10, filed March 16, 2005)** is DENIED; however, the papers filed are received as *amici curae* briefs.

IT IS FURTHER ORDERED that Fleser and Robinson's Motion to Intervene as *amici* **(Docket No. 42, filed June 2, 1005)** as to any papers already filed is GRANTED.

IT IS FURTHER ORDERED that STTOP's Motion to File Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction **(Docket No. 45, filed June 16, 2005)** is DENIED.

/s/ DENISE PAGE HOOD
DENISE PAGE HOOD
United States District Judge

DATED: September 12, 2005

19